Opinion delivered March 6, 1889.

---

No. 2724.

## MILES REED v. THE STATE.

ASSAULT TO RAPE—NEWLY DISCOVERED EVIDENCE—NEW TRIAL.—The indictment in this case charged an assault to rape by force, and the allegation was supported by the testimony of the prosecutrix. The proof for the defense, however, not only contradicted her testimony materially, but tended to prove her consent. Upon this state of evidence the defense asked a new trial to produce newly discovered evidence strongly supporting the theory of consent. *Held* that, under the facts in proof, the new trial should have been awarded on the newly discovered evidence adduced by the defense.

APPEAL from the District Court of Williamson. Tried below before the Hon. W. M. Key.

The conviction in this case was for an assault with intent, by force, to rape one Sallie Colvin, in Williamson county, Texas, on the twenty-third day of November, 1888. The penalty assessed against the appellant was a term of four years in the penitentiary.

Sarah Colvin, the alleged injured party, was the first witness introduced by the State. She testified that she was eleven years old, and lived in the town of Georgetown, Williamson county, Texas. On the day alleged in the indictment, the witness went to a point in the brush near Georgetown, frequented by negroes for the purpose of answering calls of nature. The witness went there for that purpose. Defendant soon came to where she was and said to her: "Come and do it with me." Witness replied: "No, I will not; my mother does not allow me to do that." She then started home, when the defendant overtook, threw her down, pulled up her clothes, tore off her drawers, and by force, without her consent and against her

will, had carnal knowledge of her, by inserting his male member into her sexual organ. During the period of this enforced act of copulation, the witness was held down by the defendant, who likewise kept one hand pressed over her mouth. She struggled with all of her strength, but was unable to push the defendant off, or to utter a cry for help. He remained on top of witness, moving his male member to and fro in her sexual organ, until witness's cousin, Dora Cook, suddenly appeared on the scene, when he jumped off and fled.

The cross examination of this witness, which was close and searching, was directed to the development of the issue raised by the defense of the witness's consent to the carnal act. It disclosed that the defendant was a local preacher of the Methodist Episcopal Church, and that he lived in a house near the house of the witness's mother, with whom the witness lived. The bushes to which the witness went to answer a call of nature were nearer the defendant's house than to the witness's mother's house, and in going to the said bushes from the last named house one would necessarily pass near the defendant's house. There were other bushes in the opposite direction from the witness's mother's house, but they were somewhat further off than the bushes to which the witness went. Both of said places were customarily used by the colored people as privies. On the day of but before the outrage, the witness went to the house of the defendant in search of her mother. The defendant was at home when witness arrived at his house, but not when she left it. He came to her in the bushes soon afterwards. The witness was on the outside of Lee Taylor's fence when the defendant asked her to copulate with him. She replied as stated in her direct examination, and crawled through the fence into Mr. Taylor's lot, and was stooping down picking up acorns when the defendant seized and threw her down and had forcible connection with her. She neither ran nor hallooed while the defendant, in a half run, was pursuing her, for the reason that she did not believe he would hurt her. From the point where he solicted the carnal favor of the witness to the point where he followed her and helped himself, the distance was about one hundred yards. When he seized her he put his left hand over her mouth, threw her down, and with his right hand pulled her legs apart, unbuttoned her drawers and tore them off one of her legs, took out his male member while on his knees between her legs, lay down on the witness, with his breast

against hers, inserted his penis into her private organ, and made two or three excentric motions with his buttocks before he succeeded in introducing his penis into witness's private organ. He then continued the copulative process until Dora Cook intruded upon the scene, when he suddenly released the witness and decamped. He was on the witness but a short time. As soon as she was released the witness raised up on her elbow, and saw Dora Cook through an opening in the fence. Neither the witness nor Dora spoke to the other, nor did Dora cross the fence into the lot where the outrage occurred. The drawers worn by the witness were button drawers. Defendant first undid the buttons, and then tore the drawers off one leg. The place of the outrage was in the northwest corner of Mr. Taylor's lot, under a hill, about twenty-five steps from Taylor's house. The houses of Mr. Williams and Mr. Roberts were not a great distance from the place of the outrage. The witness reiterated that the copulative act was committed upon her by the defendant by force, without her consent, against her will, and despite such resistance as she was able to make. Asked by the defendant's counsel if she enjoyed the sexual act forced upon her, she replied that she did not, and, in response to the further inquiry of persistent counsel as to *why* she did not like it, she replied laconically: "Because I was mad."

Dora Cook, the cousin of the prosecutrix, testified, for the State, that on the day alleged in the indictment she went to the bushes in the rear of Mr. Taylor's lot for the purpose of responding to a call of nature. As she approached the northwest corner of Taylor's lot from the outside she saw the defendant on top of Sallie Colvin, "shuffling up and down" on Sallie, who was lying back down on the ground. His breast lay on Sallie's breast, and his face was held close to hers. As soon as he discovered the witness, the defendant jumped up and ran off. Sallie raised her head to rest on one elbow, and looked through the fence at witness. She did not speak to witness, nor did witness speak to her. Witness went immediately to Sallie's mother, reported what she had seen, and within a few minutes a complaint was lodged against defendant and he was arrested. Taylor's house stood in the southeast corner of his lot, diagonally across from the corner in which witness discovered defendant on Sallie Colvin. The said house was on a hill, and the said northwest corner of the lot was under the hill, some trees and brush intervening between the two points.

Bettie Colvin, the mother of the prosecutrix, testified, for the State, that immediately on her return from the brush Dora Cook told her of the discovery by her of the defendant on witness's eleven year old daughter Sallie. Witness started at once to the place indicated, and met her said daughter coming toward home. Her daughter then told her about defendant's outrage upon her, and witness at once took the child to town and had a complaint lodged against defendant. She then examined the girl's underclothing, drawers and private parts. The drawers, which were not button drawers, and did not open in front, were ripped open between the legs at the place where they covered the private organ. They were not torn when Sallie put them on, the Sunday previous. Witness could not swear that defendant tore those drawers, but they were torn. Witness observed no blood on Sallie's private parts.

County Attorney R. A. John testified, for the State, that the corner of the fence in which Sallie Colvin claimed she was assaulted by the defendant was about two hundred and seventy feet distant from Taylor's house, and a little further from Roberts's house. A few trees, brush and undergrowth intervened between the said houses and the said corner, and, while witness would not swear positively that two persons copulating in said corner could not be seen from said houses, he did not think they could.

Doctor Foster testified, for the defense, that he examined the sexual organ of the girl Sallie Colvin about an hour after the outrage was alleged to have been committed. He found the girl's drawers torn, but there was nothing about the appearance of the sexual organ to indicate recent penetration. As a matter of fact her sexual organ had not been penetrated. It could not have been penetrated by the penis of such a man as the defendant without retaining indubitable evidence of such penetration.

Henry Smith and Monroe Sansom testified, for the defense, that they were familiar with the ground between the place of the alleged outrage and the houses of Taylor and Roberts, and in their opinion two persons copulating in the northwest corner of Taylor's lot could be seen from either house. It was possible, however, that, while lying on the ground, if copulating in that position, they could not be seen from Taylor's house. The opinion sets out the substance of the newly discovered evidence upon which the motion for new trial was based.

No brief for the appellant on file.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE.　This conviction is for an assault with intent to commit rape.

The only issue upon the trial to be determined by the jury was consent *vel non*.　If what the prosecutrix swore was the truth, appellant used the force required in such cases to accomplish his purpose.　She is shown, however, not only to have sworn falsely regarding material matters, but her conduct, when they were discovered by Dora Cook, upon the hypothesis of rape, or assault to rape, was unnatural and inconsistent.

The issue being force or consent—force shown by the evidence of the prosecutrix, and consent strongly presented by the attending circumstances—we are of opinion that a new trial should have been granted to obtain the newly discovered evidence shown in the affidavit of Barbara and Alice Brown, Nellie Brown and Eliza Smith.

Barbara and Alice Brown swore "that, a few minutes after the alleged assault, the prosecutrix came to their house and told them that Miles Reed had got on top of her, and done it to her, and that Miles Reed gave her ten cents to let him do it; and that she showed them the ten cents, and said she was going up to town and buy some candy with it; that she would give them some of it; that she saw some women coming towards them and thought it was her mother and ran off, and when she found that it was not her mother she came back." Barbara relates the matter about the prosecutrix running off when she thought she saw her mother coming.

Nellie Brown saw the ten cents, and places the prosecutrix at her house with the children Barbara and Alice at the time sworn to by them.

The judgment is reversed and the cause remanded.

　　　　　　　　　　　　　　　*Reversed and remanded.*